***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Harris with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter. *Page 2 
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated, and there is no question as to misjoinder or nonjoinder of parties.
4. The carrier on the risk in this claim was Specialty Risk Services.
5. An employment relationship existed between the employee and employer on June 10, 2004.
6. Plaintiff had carpal tunnel release surgery on her right wrist on December 23, 2005 and on her left wrist on January 26, 2006. Plaintiff returned to work on April 17, 2006 and was back out of work on April 21, 2006. Plaintiff has remained out of work since April 21, 2006.
7. Plaintiff's average weekly wage is $732.31, yielding a compensation rate of $488.50.
8. On or around November 16, 2005, plaintiff began receiving short-term disability ("STD") benefits of $360.00 per week through an employer-funded STD benefits plan.
9. Plaintiff has received said STD benefits for a period of 50 weeks.
10. If the present claim is adjudicated to be compensable, and if plaintiff is thereby awarded compensation benefits for any past-due temporary total disability benefits, then defendants shall claim a credit for said 50 weeks of STD benefits pursuant to N.C. Gen. Stat. § 97-42.
11. The following documents were accepted into evidence as stipulated exhibits:
 a. Exhibit 1: Executed Pre-Trial Agreement; *Page 3 
 b. Exhibit 2: Industrial Commission Forms, plaintiff's medical records, parties' discovery responses; and ergonomic evaluation reports;
 c. Exhibit 3: Plaintiff's pay records;
 d. Exhibit 4: Transcript of plaintiff's recorded statement; and
 e. Exhibit 5: Plaintiff's "Pre-Placement Health Assessment"
12. Transcripts of the depositions of Dr. Paul Rush and Charles Jackson were also received after the hearing before the Deputy Commissioner.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 36 years old at the time of the hearing before the Deputy Commissioner and is a high school graduate. She has had some nursing coursework in community college but did not attain a degree. Her work experience has been in manual labor and factory work. Plaintiff is 5'6" and weighs about 170 pounds.
2. Defendant-employer is a manufacturer of glass for automobiles and buildings. Plaintiff has worked for defendant-employer since 1996. Her last position with defendant-employer was in the end cap department, where she was involved in the process of banding and putting end caps on stoces, or packs of glass sheets suitable for shipping.
3. In order to get the end caps on the stoces, plaintiff had to use a great deal of force pushing on them, pressing on them, and even hitting them with the heels of her hands.
4. Plaintiff wore heavy yellow gloves while she performed her end capping function and putting the end caps on the stoces made her hands sore. *Page 4 
5. In the banding portion of her job, plaintiff would tighten the bands with a manual ratchet, cranking the ratchet until the bands were tight. The ratchet resembled a large pair of bolt cutters and was operated with one hand on each handle. Getting the band to the required tightness required several cranks on the ratchet, and the last crank was always the hardest, requiring a significant amount of force. Using the ratchet made plaintiff's hands tired and sore beginning sometime in 2004.
6. The manual banding task is intense, hard labor and caused significant pain in the hands and wrists of plaintiff as well as other co-workers who performed the same job.
7. Plaintiff normally worked on a team that did not have an automatic bander and in any event, the stoces could be banded more quickly by hand than with the automatic bander. Each team was on a standard production quota of 63 stoces per 8-hour shift. Rotating to other duties was not a company policy and plaintiff's team did not practice it.
8. Plaintiff could do all of the requirements on her team, but she was frequently assigned the job of placing end caps and doing the manual horizontal banding.
9. On June 9, 2004, plaintiff presented to River Quest Medical Care and was found to have positive Tinel's and Phalen's signs in her right wrist. Maxine Blue, NP-C believed that plaintiff had carpal tunnel syndrome and referred her to Dr. Mahon at Scotland Neurology for further evaluation.
10. Dr. Mahon examined plaintiff on July 13, 2004 and found a bilateral Tinel's sign, right greater than left, and decreased appreciation of pin prick in the right median distribution. Dr. Mahon also indicated that plaintiff had reported numbness in both hands and he diagnosed probable carpal tunnel syndrome bilaterally. He recommended an EMG and a nerve conduction study and performed these tests. After receiving the results, Dr. Mahon referred plaintiff to Dr. *Page 5 
Rush of Scotland Orthopedics for a second opinion. Dr. Mahon also wrote a script stating, "I am of the opinion that the patient's carpal tunnel syndrome is work-related." Because of illness, Dr. Mahon was unable to give a deposition in this case, but as Dr. Rush testified, Dr. Mahon is a good and competent physician.
11. Dr. Rush reviewed the test results and examined plaintiff on October 13, 2004. He found positive Tinel's and Phalen's signs on both median nerves. He diagnosed bilateral carpal tunnel syndrome, right worse than left.
12. Dr. Rush recommended a conservative course of treatment, including wrist splints and pain medication. Plaintiff initially refused any more invasive treatment options, including cortisone shots. Then, in May of 2005, she reported that her symptoms were persisting, even with the use of the splints at night. Plaintiff reported that her left wrist was bothering her worse than the right. Dr. Rush determined that plaintiff had failed conservative care and he recommended open carpal tunnel releases.
13. Plaintiff continued working during this period of time, and then, in November of 2005, she returned to Dr. Rush. Plaintiff reported that she was having increasing tingling in her hands, particularly on the right. Plaintiff also reported cramping in her hands. Dr. Rush felt that plaintiff needed a period of time without using her hands because they were so sensitive upon presentation to him, so he wrote plaintiff completely out of work effective November 9, 2005. He also continued to recommend surgical intervention.
14. During this period of time, plaintiff had trouble holding a telephone for very long and blow-drying her hair. She could not open jars or hold her arms up in the air for any length of time. Washing her hair and mopping caused increased pain in her hands, as did writing for long periods of time and driving. When she used the ratchet at work, it hurt her hands, as did lifting *Page 6 
the end caps. Plaintiff also dropped items because she lost her grip, and any lifting, twisting, holding or grasping was painful.
15. Plaintiff finally underwent a right carpal tunnel release with Dr. Rush on December 23, 2005. After the surgery, she reported that she was doing much better on the right, but her left hand still hurt.
16. Plaintiff underwent a left carpal tunnel release with Dr. Rush on January 26, 2006. Afterward, plaintiff had no initial complaints, but about a month and a half later she had tingling in her left hand. Dr. Rush prescribed Lyrica, which improved plaintiff's symptoms, but then plaintiff began to suffer increasing symptoms, including tingling and feelings of "fullness" in her hands.
17. Dr. Rush prescribed physical therapy for plaintiff, which she underwent with Charles Jackson at Scotland Memorial Hospital in May and June of 2006. After about a month of physical therapy, plaintiff's left wrist strength had improved slightly, but her grip strength and pinch strength had not improved at all. Mr. Jackson discharged plaintiff from physical therapy without her having reached her treatment goals.
18. On April 17, 2006, plaintiff went back to work on full duty, but then she went out of work on April 21, 2006 because defendant-employer's physician indicated plaintiff could not perform her pre-injury job. Dr. Rush also wrote plaintiff out of work from May 18, 2006 until June 28, 2006 due to complaints of bilateral hand pain.
19. On June 28, 2006, Dr. Rush released plaintiff to return to work with no restrictions at plaintiff's request so that she could try to go back to work.
20. On July 10, 2006, at the behest of defendants, plaintiff was seen at Scotland Memorial Hospital's Occupational Health Services department, where she was assigned *Page 7 
restrictions of no heavy gripping, pushing or pulling with her hands and no repetitive movement of her wrists or hands. A physician also wrote that plaintiff should not work within two hours of taking her medication, Voltaren. Defendant-employer was unable to accommodate plaintiff's restrictions in her pre-injury position or any other suitable position and plaintiff has not returned to work with defendant-employer.
21. On May 9, 2007, plaintiff told Dr. Rush that she was still having periodic discomfort in her hands and right forearm. Based on her May 9, 2007 presentation, Dr. Rush opined that plaintiff should not go back to any repetitive activity requiring any forceful gripping.
22. Defendant-employer has been unable to accommodate plaintiff's work restrictions. Plaintiff has not been terminated and, at the time of the hearing before the deputy commissioner, defendant-employer is looking for work within its facility that plaintiff could perform within her restrictions.
23. Dr. Rush and Mr. Jackson recommend that plaintiff undergo a functional capacity evaluation ("FCE") in order to ascertain her abilities and specify her current work restrictions. They recommend the Ergo Science FCE at Scotland Memorial Hospital because it simulates what a person can do over an eight-hour workday.
24. Dr. Rush opined that plaintiff's job with defendant-employer significantly contributed to her developing bilateral carpal tunnel syndrome. Dr. Rush testified that the fact that plaintiff developed pain while performing the end-capping and banding functions and that she did not have rest time between periods of doing these activities because she was performing other work functions with her hands during these periods were both important facts upon which to base a causation opinion. *Page 8 
25. Dr. Rush further opined that if plaintiff had some pre-existing tendon inflammation in her wrists, as defendants contend, then it would make it even more likely that plaintiff would develop carpal tunnel syndrome from doing her job, as an aggravation of her pre-existing condition.
26. Dr. Rush also testified that plaintiff's job duties with defendant-employer put her at an increased risk, over that faced by the general population, of developing carpal tunnel syndrome.
27. Defendants submitted two ergonomic studies, the Zurich and the Brodie studies. However, neither study author was deposed. Based on the limitations of the studies and the lack of the opportunity for cross-examination of the authors, the undersigned accord more weight to the testimony of Dr. Rush than to the conclusions set forth in the Zurich and Brodie studies. For example, the Brodie study concluded that the manual banding function did not expose a worker to an increased risk of developing carpal tunnel syndrome because, as the evaluator wrote, the force used to make the last few turns of the ratchet involved less than 50 percent of the worker's strength. This conclusion does not comport with the credible evidence of record that the use of the ratchet caused significant pain to several workers' hands and wrists. The Brodie study also did not give due consideration to the other tasks of plaintiff's job, such as end-capping and lifting, and whether plaintiff had time to rest her wrists while doing these other tasks.
28. Based upon the greater weight of the competent, credible evidence, plaintiff's job with defendant-employer significantly contributed to the development or aggravation of plaintiff's bilateral carpal tunnel syndrome. Plaintiff's job duties with defendant-employer placed plaintiff at an increased risk over the general population of developing carpal tunnel syndrome. *Page 9 
29. Plaintiff was written completely out of work by her treating physician from November 9, 2005 through April 16, 2006 and from May 18, 2006 through June 28, 2006 due to her compensable occupational disease. Plaintiff has been unable to perform any work for defendant-employer since April 21, 2006 when defendant-employer's physician restricted plaintiff from performing her pre-injury job and defendant-employer has not offered other suitable work to plaintiff.
30. The majority of plaintiff's work experience has been in manual labor and factory work. Plaintiff is a high school graduate and has worked for defendant-employer for over ten years performing manual labor jobs. Plaintiff is restricted from any heavy gripping, pushing pulling or any repetitive movement with her hands.
31. The evidentiary hearing before the deputy commissioner took place on September 13, 2006, about three months after plaintiff's full-duty release by Dr. Rush. Plaintiff did not seek employment between June 28, 2006 and September 13, 2006.
32. After plaintiff was restricted from performing her pre-injury job by defendant-employer's physicians on April 21, 2006 and July 10, 2006, defendant-employer indicated they would attempt to find suitable work at their facility for plaintiff. Thus, plaintiff did not conduct any job search outside of employment with defendant-employer from June 28, 2006 through September 13, 2006.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: *Page 10 
 CONCLUSIONS OF LAW
1. Plaintiff's employment with defendant-employer exposed her to an increased risk, over that faced by the general population, of developing carpal tunnel syndrome and was a significant contributing factor in the development or aggravation of plaintiff's bilateral carpal tunnel syndrome. As such, plaintiff's bilateral carpal tunnel syndrome is a compensable occupational disease, with a date of onset of on or about June 10, 2004. N.C. Gen. Stat. § 97-53(13).
2. In order to meet the burden of proving continuing disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable effort, been unsuccessful in her efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc., supra. *Page 11 
3. In the case at hand, plaintiff was totally disabled from November 9, 2005 through April 16, 2006 and from May 18, 2006 through June 28, 2006 in that she was incapable of any work, because of her compensable condition, during that period. Russell v. Lowe's ProductDistribution, supra. Plaintiff has not met her burden of proving continuing disability between April 16, 2006 and April 21, 2006 as she had returned to work at her pre-injury job with defendant-employer. On April 21, 2006, plaintiff was restricted by defendant-employer's physician from performing her pre-injury job and on May 18, 2006, plaintiff was written completely out of work by Dr. Rush. Once plaintiff was released to return to work by Dr. Rush on June 28, 2006, she was given assurances by defendant-employer that they would attempt to find suitable work for plaintiff and that plaintiff remained employed. Given these circumstances, it was reasonable that plaintiff did not conduct further job search outside employment with defendant-employer between April 21, 2006 and September 13, 2006, the date of the evidentiary hearing before the deputy commissioner. Id.
4. Plaintiff is entitled to temporary total disability compensation for the periods from November 9, 2005 through April 16, 2006 and April 21, 2006 through September 13, 2006. N.C. Gen. Stat. § 97-29.
5. Defendants are entitled to a credit for short-term disability benefits paid as set out in Stipulation No. 10. N.C. Gen. Stat. § 97-42.
6. Plaintiff is entitled to have defendants pay for the medical treatment she has heretofore received for her compensable bilateral carpal tunnel syndrome, and she is entitled to have defendants provide further medical treatment for her compensable condition, including the FCE recommended by Dr. Rush and Mr. Jackson. N.C. Gen. Stat. §§ 97-2(19);97-25.
 *********** *Page 12 
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff is entitled to temporary total disability compensation for the periods from November 9, 2005 through April 16, 2006 and April 21, 2006 through September 13, 2006. N.C. Gen. Stat. § 97-29. Defendants are entitled to a credit for STD benefits paid as set out in Stipulation No. 10. N.C. Gen. Stat. § 97-42.
2. Plaintiff is entitled to have defendants pay for the medical treatment she has heretofore received for her compensable bilateral carpal tunnel syndrome, and she is entitled to have defendants provide further medical treatment for her compensable condition, including the FCE. N.C. Gen. Stat. §§ 97-2(19); 97-25.
3. Defendants shall pay the costs.
This the 22nd day of April, 2008.
 S/___________________
 DIANNE C. SELLERS
 COMMISSIONER
CONCURRING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER